FILED
AUG 10 2022
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:22 CR 450 |
| MATTHEW J. TURNIPSEEDE, | ) ) | Title 18, United States Code, Sections 1341 and 1343 |
| Defendant. | ) ) | |

JUDGE BOYKO

GENERAL ALLEGATIONS

At all times relevant to this Indictment:

I. The Defendant and Relevant Entities

1. Defendant MATTHEW TURNIPSEEDE was a resident of Las Vegas, Nevada, in the District of Nevada.

2. Edgewize LLC ("Edgewize") was a limited liability company incorporated in the State of Nevada on or about June 6, 2013. At the time of its creation, Defendant was the sole member of Edgewize.

3. Moneyline Analytics ("MLA") was incorporated in the State of Nevada on or about June 3, 2015. At the time of its creation, Defendant was the sole member of MLA.

4. Edgewize held three bank accounts with Bank 1, a federally insured financial institution headquartered in Charlotte, North Carolina. Defendant was the sole signatory on the Bank 1 accounts. One of the accounts was closed on or about April 30, 2016, and two were closed on or about December 31, 2016. Defendant transferred the remaining balances in the Edgewize

accounts to MLA's Bank 2 accounts and Defendant's personal accounts at Bank 1 when the Edgewize accounts closed.

5. MLA held three bank accounts with Bank 2, a federally insured financial institution headquartered in San Francisco, California. Defendant was the sole signatory on the MLA accounts. MLA's account ending in *1137 closed on or about March 19, 2021, with a balance of approximately $7,748.55 transferred to the MLA account ending in *1553. MLA's account ending in *9671 closed on or about March 31, 2021, with a balance of approximately $91.00 transferred to the MLA account ending in *1553. MLA's account ending in *1553 closed on July 31, 2021, with a balance of approximately $0.00 when closed.

6. In or around January 2019, Defendant presented Operating Agreements to approximately ten Victims to establish Moneyline Analytics – Dublin Branch ("MLA DUB").

7. MLA DUB was a limited liability company incorporated in the State of Nevada on or about October 10, 2018. At the time of its creation, Defendant was the sole member.

8. MLA DUB did not hold any bank accounts despite Defendant representing to the Victims that MLA DUB held accounts at Bank 2. Victims' investments into MLA DUB were instead deposited into the MLA accounts at Bank 2.

9. Individual 1 was an individual, known to the grand jury, who resided in the Northern District of Illinois. Defendant referred to Individual 1 as "the Professor" in messages to the Victims.

10. Turnipseede Company 4 was incorporated in the State of Nevada on or about February 26, 2020. At the time of its formation, membership in Turnipseede Company 4 consisted of MLA (which had a 25% share); a company associated with Individual 1; and six other members, four of whom had also invested in MLA and MLA DUB.

11. Turnipseede Company 4 held three bank accounts with Bank 2. The first account, ending in *9907, had Defendant as the only signatory. Bank 2 *9907 was opened on or about July 9, 2020, and closed on or about July 31, 2021. The second account, ending in *4956, was opened on or about July 28, 2020, and had Defendant and Individual 1 as signatories. Bank 2 *4956 was closed on or about May 28, 2021. The third account, ending in *6130, had Defendant as the only signatory. Bank 2 *6130 was opened on or about February 26, 2021, and closed on or about July 31, 2021.

12. Edgewize, MLA, MLA DUB, and Turnipseede Company 4 were all in the business of sports betting.

13. Defendant used an email address with the domain name "Matt@moneylineanalytics.com" to communicate with the Victims. This email address was hosted by Internet Company 1.

14. Internet Company 1 was an internet domain registrar and web hosting company headquartered in Tempe, Arizona, and incorporated in Delaware. Internet Company 1's email servers were located in Tempe, Arizona.

15. Defendant used an email address with the domain name "mattturnipseede@[Internet Company 2].com" to communicate with the Victims. This email address was hosted by Internet Company 2.

16. Internet Company 2 was an email provider headquartered in Mountain View, California. Internet Company 2's email servers were located in Mountain View, California.

17. Accounting Firm 1 was an accounting firm headquartered in Minneapolis, Minnesota.

18. Bank 3 was a federally insured financial institution headquartered in Minneapolis, Minnesota.

19. Individuals who invested in Edgewize, MLA, MLA DUB, and Turnipseede Company 4 ("the Victims") resided in jurisdictions throughout the United States, including in the Northern District of Ohio.

20. Victim J.C. was an individual, known to the grand jury, who resided in the Northern District of Ohio, Eastern Division. He was employed by Illinois Company 1 and used the email address "[J.C.]@[Illinois Company 1].com"

21. Illinois Company 1 was headquartered in Vernon Hills, Illinois. Its email servers were located in Redmond, Washington.

22. Victim T.W.1 was an individual, known to the grand jury, who resided in the Southern District of Ohio.

23. Victim M.W. was an individual, known to the grand jury, who resided in the Southern District of Ohio.

24. Victim D.G. was an individual, known to the grand jury, who resided in the Southern District of Ohio.

25. Individual 2 was an individual, known to the grand jury, who resided in the District of Nevada.

 II. The Scheme to Defraud

26. It was part of the scheme to defraud that from at least on or about March 9, 2015, to on or about May 13, 2021, Defendant MATTHEW TURNIPSEEDE induced the Victims to invest money in Edgewize, MLA, MLA DUB, and Turnipseede Company 4 by falsely claiming his sports betting method resulted in double-digit profits. In actuality Edgewize, MLA, MLA DUB, and Turnipseede Company 4 never generated the profits that Defendant represented to investors. Instead, Defendant used the Victims' money to perpetuate the scheme by using investor money

to maintain the business and seek new sources of funds; to pay off Victims who had invested earlier; and to fund his personal expenses.

27. From at least on or about March 9, 2015 to on or about May 13, 2021, and based on Defendant's fraudulent representations, at least approximately 72 Victims invested an aggregate total of approximately $8.5 million in Edgewize, MLA, MLA DUB, and Turnipseede Company 4.

28. Defendant provided Victim investors in Edgewize, MLA, and MLA DUB with operating agreements in which he claimed that all money invested would be used exclusively to place bets on sporting events, and that Defendant would not be paid any compensation for placing wagers but would retain a percentage of the winning profits.

29. From on or about February 2015 to on or about December 2020, Defendant emailed periodic written statements to Victims who had invested in Edgewize, MLA, and MLA DUB purporting to show double-digit investment returns.

30. From on or about March 15, 2018 to January 14, 2021, Defendant employed Accounting Firm 1 to provide IRS Form K-1 statements to the Victims who had invested in MLA. Accounting Firm 1 generated the IRS Forms K-1 for MLA based on figures provided by Defendant; Accounting Firm 1 did not independently verify the account balances of MLA.

31. MLA was the only one of Defendant's businesses for which Accounting Firm 1 prepared IRS Forms K-1. Accounting Firm 1 prepared IRS Forms K-1 for tax years 2017, 2018, and 2019.

32. The IRS Forms K-1 for MLA that Accounting Firm 1 provided to the Victims reflected double-digit profits consistent with Defendant's representations to the Victims.

33. The Victims relied on the Forms K-1 when filing their individual taxes.

34. In reality, Defendant's bets never generated the profits represented to investors and the profit information Defendant provided to Accounting Firm 1 for inclusion in the IRS Forms K-1 was fraudulent.

35. The money the Victims sent to Defendant to invest accounted for approximately more than 98% of the total deposits into the bank accounts associated with Edgewize, MLA, MLA DUB, and Turnipseede Company 4. There were no deposits consistent with the profits represented to the investors and the profit information Defendant provided to Accounting Firm 1 for inclusion in the IRS Forms K-1.

36. If a Victim asked to withdraw some or all of that Victim's money from Edgewize, MLA, MLA DUB, or Turnipseede Company 4, Defendant used money from other Victims' investments to cover the withdrawal.

37. Defendant also used the Victims' money to finance his personal expenses, including family vacations to Disneyland and Hawaii; spa treatments; lease payments on multiple vehicles; and country club membership dues.

## MANNER AND MEANS OF THE FRAUD

38. In or around January to February 2019, Defendant met with individuals, including J.C. and T.W.1, in a restaurant in Dublin, Ohio. Defendant told J.C. that his betting system was generating double-digit returns on investment. As a result of Defendant's representations and J.C.'s knowledge that others had previously invested with Defendant, J.C. decided to invest with Defendant.

39. On or about February 25, 2019, J.C. wrote a check payable to MLA for $50,000.00 and sent it via regular U.S. Mail from the Northern District of Ohio to Defendant's residence in the District of Nevada.

40. On or about March 1, 2019, J.C.'s $50,000.00 check was deposited into MLA's Bank 2 account ending in *1553.

41. On or about March 27, 2019, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C., T.W.1, D.G., and other Victims with the subject line "News & Updates." In the email Defendant told the Victims:

   a. "Since your money is all working, there are increases in the nest egg almost daily";

   b. "I am in Washington DC today – meeting with 5-7 people tonight…and should they join, will be the first 'public' entries into our new MLA DUB LLC project!";

   c. "On the tax front…I do expect the K1's very soon. As you know, we are a partnership, thus relying on information from everyone in it…and sometimes people are 'relaxed' in getting me the information"; and

   d. "If you have people that might be interested, please reach out to me…or give them my information…and I'll happily come to OH for a thorough demo."

42. On or about May 1, 2019, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C. with the subject line "report". The email included an attached MLA Shareholder Report for J.C. purporting to show the value of J.C.'s investment in MLA for the time period from February 25, 2019 to April 30, 2019. The report reflected an investment value of $50,000.00 as of February 25, 2019; "Year-to-Date Deal Period Earnings" of $1,578.00; and an "Investment Value as of 4/30/19" of $51,578.00.

43. On or about November 4, 2019, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C. with the subject line "3rd q report". The email included an attached MLA Shareholder Report for J.C. purporting to show the value of J.C.'s investment in MLA for the time period from February 25, 2019 to October 31, 2019. The report reflected an investment

value of $50,000.00 as of February 25, 2019; "Year-to-Date Deal Period Earnings" of $7,397.00; and an "Investment Value as of 10/31/2019" of $57,397.00.

44. On or about January 11, 2020, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C., T.W.1, D.G., and other Victims with the subject line "MLA Meeting coming FEB 19!" In the email, Defendant told the Victims that it had been "another terrific year for MLA."

45. On or about January 18, 2020, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C. with the subject line "end of year". The email included an attached MLA Shareholder Report for J.C. purporting to show the value of J.C.'s investment in MLA for the time period from February 25, 2019, to December 31, 2019. The report reflected an investment value of $50,000.00 as of February 25, 2019, "Year-to-Date Deal Period Earnings" of $7,520.00, and an "Investment Value as of 12/31/2019" of $57,520.00.

46. On or about March 12, 2020, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C., T.W.1, D.G., and other Victims with the subject line "Update from Las Vegas". In the email, Defendant told the Victims:

   a. "We had another fabulous year – as the K1 will reflect – and I'm proud to say we will have another in 2020 as our team has grown to 27 strong, and our algorithms and placement specialists are coming off record years in earnings by volume."

   b. Defendant also addressed the then-emergent COVID pandemic, saying, "Our algorithms are built to function off of certain filters and portals that can simply be adjusted to fit the number of days MLB decides to play, and we're well funded for the delay. Additionally, our micro-wagering team so large and strong, there will not be any additional stress on the program from an operations standpoint. I have been in

constant contact with Professor [Individual 1] and together, he and I have made the necessary algorithmic adjustments to move forward if they miss a month…and still make our fabulous numbers."

47. On or about April 14, 2020, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C. with the subject line "K1". The email included an attached letter from Accounting Firm 1 addressed to J.C. advising him that they had attached a copy of his 2019 Partnership Form 1065 Schedule K-1 as well as the associated K-1. The 2019 Form K-1 indicated J.C.'s net income from MLA was $7,520.00.

48. On or around September 11, 2020, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C. and other Victims with the subject line "Update from Las Vegas". In the email, Defendant told the Victims:

   a. "we are having the best summer to date…and the reasons are numerous";
   b. "We have never had this much activity in the summertime. Baseball is full swing, which means so is Professor [Individual 1]. Our main projects involving [Individual 1] are on par with my expectations, and some of our special projects are ahead of pace – despite the 2-month hiatus";
   c. "We are up to 28 people on staff now, and a training room next to my office that is always full. My staff has proven to be capable, eager, accurate, and talented…this was a difference-making move in bringing them on";
   d. "I brought another mathematician [Individual 2] on board […] His brilliance and insight in my world has already proven fruitful, and I got [Individual 2] and [Individual 1] together last week. Not only are they both in lockstep with each other…but they are both highly supportive of my Boards approach"; and

9

      e. "It would provide me great pleasure and pride to bring you all out […] to view a 'day in the life' of what transpires here. I'd love to show you a live class I teach weekly, have you watch my staff create your wealth, dine with [Individual 2] and [Individual 1], and perhaps golf or enjoy some good Las Vegas weather. Most of all I'd like you to see what it is that I do, how I start my day being a good steward of your investment, and our plans for 2021 as well."

49. Individual 2 was never employed by Defendant or any of his companies.

50. On or around December 15, 2020, T.W.1 contacted Defendant asking for a partial withdrawal of his and M.W.'s investments in MLA and MLA DUB.

51. On or around January 6, 2021, T.W.1 emailed Defendant asking for an additional partial withdrawal of his investments in MLA and MLA DUB.

52. On or around January 12, 2021, D.G. emailed Defendant asking to withdraw his money from MLA DUB. Per J.C.'s operating agreement with Defendant, Defendant had 60 days to return the money.

53. On or around January 14, 2021, Accounting Firm 1 terminated its relationship with Defendant and MLA. Accounting Firm 1 did not generate any IRS Forms K-1 for MLA for tax year 2020 prior to terminating the relationship.

54. On or around January 20, 2021, T.W.1 received his and M.W.'s requested funds from MLA in the form of Bank 2 cashier's checks.

55. On or around January 22, 2021, J.C. emailed Defendant asking to withdraw his money from MLA. Per J.C.'s operating agreement with Defendant, Defendant had 60 days to return the money.

56. On or around January 23, 2021, Defendant sent an email from mattturnipseede@[Internet Company 2].com to mattturnipseede@[Internet Company 2].com; J.C. received the email via blind carbon copy ("bcc"). In the email, Defendant said:

   a. "I am writing to update you on the present state of the companies. […] Recently, due to many factors illuminated below, the company finds itself in a position where our loss thresholds have rapidly dropped much lower than I am comfortable with. Due to numerous, recent withdrawals, all MLA, MLA DUB, and [Turnipseede Company 4] withdrawals must be put on hold for a time period of 9 months, and to be re-evaluated at that time";

   b. "Not only do several massive withdrawals upset the balance of the fund, but other factors have played a major role in this situation too";

   c. "Covid-19 has played a major role in both sports performance and client withdrawals. […] As you know, all American sports stopped playing for the better part of three months, leaving many unclosed 'threads' of business left to be captured. As play slowly resumed, the rosters of the teams were incomplete, often unlisted and harder to find, making the process of identifying winners more difficult. […] We did rather well in several of these ventures, but numerous threads of incomplete business are still outstanding";

   d. "The MLB season only completed 37% of their regular schedule, and several player opt-outs and virus-related absences were littering the lineup cards. This created numerous threads of business that have yet to mature, and as the company has always done for you all, we are waiting for the right game or situation to take advantage of and capitalize";

e. "In December of 2019, prior to the appearance of Covid-19, I began assembling a staff to assist in all data gathering and revenue acquiring processes. […] We opened hundreds (if not thousands) of threads of revenue streams along the way, closing what we could, and saving the larger losses for a special game, set of games, or particular sport. […] While my team learned, there were some growing pains along the way. These errors were also earmarked for future completion once the right set of circumstances presented itself.";

f. "While I agreed to take on all expenses, keeping my investor's returns higher, I still absorbed this financial burden in a world without any sports to earn from, and as mentioned previously, all of my personal money is in my Company. This too very much upset my target figures.";

g. "I made the decision to keep my staff during the shutdown because I wanted to continue their training and education so they'd be fully prepared once the sports world normalized itself. To do this, they were compensated for winning wagers, instead of winning threads, while the fund waited for the right set of games or circumstances needed to recoup both wins and lost time";

h. "In a very short time period, we saw just short of one million dollars leave the fund, with $365k of that coming in the last two weeks. This sudden impact in attack bankroll has greatly altered my trajectory, and to return the fund to a safe place, I will need this time requested to properly maximize the bankroll and place the fund on the safest path possible.";

i. "The alternative would be to cash out at a severe hit to your original account value, and knowing that I have successfully navigated this world for almost a decade; this is

      the safest way to get the fund back into strong health. […] I need this time, with the current funds, to stay on the path I've always used, and make this the fund it once was before Covid-19 disrupted our trajectory"; and

   j. "Moving forward as quickly as tomorrow, new parameters for the company, the number of staff members needed to assist, and the proper number of threads to open has already been designated. I am confident in my program as it has served me well for quite some time, and will not be changing it…just the calibrations. I look forward to my next communication being a much more positive report."

57. On or about February 1, 2021, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C. and D.G. with the subject line "Re: update". In the email, Defendant told J.C. and D.G. that he "was in DC securing more funding (to assist the coffers)".

58. In or around February 17, 2021, Individual 1, a member of Turnipseede Company 4 and the co-signatory on Turnipseede Company 4's Bank 2 *4956 account, retained Forensic Accounting Firm 1 to look into what Individual 1 believed to have been up to $325,000.00 missing from Turnipseede Company 4's *9907 account.

59. On or about March 4, 2021, Defendant sent an email from mattturnipseede@[Internet Company 2].com to J.C. and D.G. with the subject "Re: Follow up to the follow up." In the email, Defendant told the victims "With K1's around the corner I am swamped getting everyone's accounts in order and correct. I'm ensuring that the value of the company and the % ownership is right – especially after so many withdrawals in a short period of time."

60. On May 12, 2021, Defendant sent an email from mattturnipseede@[Internet Company 2].com to mattturnipseede@[Internet Company 2].com; J.C. received the email via blind carbon copy ("bcc"). In the email, addressed "[t]o the members of Moneyline Analytics," Defendant

said, "I have checked on the status of the K1 forms – I have been told that they should be ready for the last week of May or the first week of June. Please plan accordingly."

61. On May 13, 2021, Defendant filed Chapter 7 bankruptcy for MLA in United States Bankruptcy Court for the District of Nevada.

## COUNTS 1 through 12
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury charges:

62. The factual allegations contained in paragraphs 1 through 61 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

63. From on or about March 9, 2015, to on or about May 13, 2021, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant MATTHEW TURNIPSEEDE knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

64. On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds by means of wire and radio communication, to wit: email communications to and from the Northern District of Ohio and elsewhere between Defendant and the Victims to induce additional financial contributions, conceal the nature of the scheme, and lull the Victims into a false sense of security about the financial soundness of Edgewize, MLA, MLA DUB, and Turnipseede Company 4, and in furtherance of the scheme to defraud described above, sent the following email communications, each email constituting a separate count:

|    | Date      | Subject                        | Recipient(s)       | Sender                                    |
|----|-----------|--------------------------------|--------------------|-------------------------------------------|
| 1  | 3/27/2019 | News & Updates                 | J.C. and others    | mattturnipseede@[Internet Company 2].com  |
| 2  | 5/1/2019  | report                         | J.C.               | mattturnipseede@[Internet Company 2].com  |
| 3  | 11/4/2019 | 3rd q report                   | J.C.               | mattturnipseede@[Internet Company 2].com  |
| 4  | 1/11/2020 | MLA Meeting coming FEB 19!     | J.C. and others    | mattturnipseede@[Internet Company 2].com  |
| 5  | 1/18/2020 | end of year                    | J.C.               | mattturnipseede@[Internet Company 2].com  |
| 6  | 3/12/2020 | Update from Las Vegas          | J.C. and others    | mattturnipseede@[Internet Company 2].com  |
| 7  | 4/14/2020 | K1                             | J.C.               | mattturnipseede@[Internet Company 2].com  |
| 8  | 9/11/2020 | Update from Las Vegas          | J.C.               | mattturnipseede@[Internet Company 2].com  |
| 9  | 1/23/2021 | update                         | J.C. (bcc)         | mattturnipseede@[Internet Company 2].com  |
| 10 | 2/1/2021  | Re: update                     | J.C. and others    | mattturnipseede@[Internet Company 2].com  |
| 11 | 3/4/2021  | Re: Follow up to the follow up | J.C. and others    | mattturnipseede@[Internet Company 2].com  |
| 12 | 5/12/2021 | K1 update                      | J.C. (bcc)         | mattturnipseede@[Internet Company 2].com  |

In violation of Title 18, United States Code, 1343.

COUNT 13
(Mail Fraud, 18 U.S.C. § 1341)

The Grand Jury further charges:

65. The factual allegations contained in paragraphs 1 through 61 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

66. From on or about March 9, 2015, to on or about May 13, 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MATTHEW TURNIPSEEDE devised and intended to devise a scheme and artifice to defraud the Victims and to obtain money by materially false and fraudulent pretenses, representations, and promises.

67. On or about February 25, 2019, in the Northern District of Ohio, Eastern Division, and elsewhere, for the purpose of executing and attempting to execute the scheme to defraud, Defendant MATTHEW TURNIPSEEDE, having devised and intended to devise any scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, placed, and caused to be placed, in any depository for mail matter, any matter and thing to be sent and delivered by the Postal Service, and took and received from the Postal Service, any such matter and thing delivered by the Postal Service, to wit: a Bank 3 check in the amount of $50,000 drawn on the Bank 3 account ending in *0356 of Victim 1 sent from the Northern District of Ohio, Eastern Division, to TURNIPSEEDE in Las Vegas, Nevada, in the District of Nevada.

In violation of Title 18, United States Code, Section 1341.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.