IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:22CR450 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW TURNIPSEEDE, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel, Acting United States Attorney Carol M. Skutnik, and Erica D. Barnhill, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing of Defendant Matthew Turnipseede. For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully asks that this Court apply upward adjustments for sophisticated means and use of a special skill; decline to apply the zero-point offender adjustment when calculating Turnipseede's Guidelines level, and set Turnipseede's total offense level at 28. The United States further requests that this Court impose a sentence within the resulting 78 to 97 month Guidelines range.

I. **APPLICABLE LEGAL STANDARDS**

A well-established legal framework guides the Court's sentencing determination. The advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an important institutional role: It has the capacity courts lack to 'base its determination on

empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a): the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

## II. SENTENCING GUIDELINES COMPUTATION

The parties' offense level calculation in the plea agreement contains both an agreed calculation and additional disputed adjustments (R. 28: Pre-Sentence Report ("PSR"), PageID 208, ¶ 2-3). The parties agree on the following:

| Wire Fraud 18 U.S.C. § 1343 (Counts 2, 3, 7, 8) | | |
|---|---|---|
| Base offense level | 7 | § 2B1.1(a)(1) |
| Loss (greater than $3.5 million) | +18 | § 2B1.1(b)(1)(J) |
| ≥10 victims | +2 | § 2B1.1(b)(2)(A)(i) |
| **Subtotal** | **27** | |

The disputed adjustments concern sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)), use of a special skill (U.S.S.G. § 3B1.3), and zero-point offender (U.S.S.G. § 4C1.1). Depending on which (if any) of the adjustments the Court applies, Turnipseede's final offense level after acceptance of responsibility could range from **22 to 28**.

For the reasons set forth below, this Court should apply the sophisticated means (+2) and special skills (+2) adjustments and decline to apply the zero-point offender adjustment (-0), resulting in a total adjusted offense level after acceptance of responsibility (-3) of **28**.

A.     TURNIPSEEDE USED SOPHISTICATED MEANS TO EXECUTE HIS SCHEME TO DEFRAUD.

The Guidelines call for a two-level enhancement where "the offense conduct involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The related application note further describes sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and then lists as nonexclusive examples "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" as conduct that would indicate sophisticated means. U.S.S.G. § 2B1.1, app. n. 9(B). Turnipseede's conduct falls squarely within the type of conduct contemplated by the sophisticated means enhancement. As part of his scheme to defraud, Turnipseede sent victim-investors fabricated periodic earnings statements showing their purported "profits." (R. 28: PSR, PageID 210, ¶ 10). These statements were false; at no point did any of Turnipseede's companies return profits even close to what he claimed on the earnings statements. (*Id.*, PageID 209-10, ¶ 9). Additionally, for tax years 2017 through 2019, Turnipseede provided investors with Schedules K-1[1] prepared by an outside accounting firm showing "profits" consistent with the information Turnipseede had provided on the earnings statements throughout the year. (*Id.*, ¶ 11). Because of Turnipseede's fictitious documents, victim-investors paid taxes on their purported "earnings." (R. 28-1: Victim Impact Statements, PageID 240, 285, 287). Turnipseede's creation of falsified earnings statements, and subsequent

---

[1] The purpose of a Schedule K-1 is to report each partner's share of the partnership's earnings, losses, deductions, and credits on an individual's tax return. The victim-investors were liable for their purported earnings from MLA on their respective income taxes. *See* About Form 1065, U.S. Return of Partnership Income, https://www.irs.gov/forms-pubs/about-form-1065 (last visited May 13, 2025).

use of the falsified earnings to cause an outside accounting firm to generate and provide victim-investors Schedules K-1, gave his purported "profits" the indicia of reliability, lulling investors into believing their "profits" were real.

Although fictitious earnings statements and K-1s are not specifically listed in the Guidelines' application note, they serve a similar purpose as fictitious entities and corporate shells – that is, to conceal the defendant's fraud and to give his conduct the veneer of legitimacy. The Sixth Circuit has upheld the application of the sophisticated means enhancement for a defendant who created "false insurance certificates" in an insurance-fraud scheme, *United States v. Crosgrove*, 637 F.3d 646, 667 (6th Cir. 2011); for a defendant who used "fictitious identification numbers" and a "dormant account" to conceal theft from a credit union, *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017); for defendants who ran a Ponzi scheme by using "fraudulent bank documents" and "fictitious website information," *United States v. Phelps*, 2021 WL 4315947, at *6 (6th Cir. Sept. 23, 2021); for a defendant who executed and concealed his fraud using a false broker's license, fictitious account documents, and fake online accounts, *United States v. Rupp*, No. 22-1240, 2023 WL 370908, at *6 (6th Cir. Jan. 24, 2023), cert. denied, 143 S. Ct. 2583, 216 L. Ed. 2d 1193 (2023); and for a defendant in a tax fraud scheme who created fictitious jobs and W-2s to support false claims of income filed with the IRS, *United States v. Pierce*, 643 F. App'x 500, 503 (6th Cir. 2016).  Turnipseede's conduct is in the same vein, and this Court should apply the two-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C).

      B.     <u>TURNIPSEEDE USED A SPECIAL SKILL TO CARRY OUT HIS FRAUD SCHEME.</u>

The Guidelines call for a two-level enhancement for the use of a "special skill" in facilitating the commission or concealment of the offense.  U.S.S.G. § 3B1.3.  The application

4

notes define "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *Id*. app. n. 4.  Here, Turnipseede claimed to have a proprietary betting algorithm that made double-digit returns. (R. 28: PSR, PageID 208, ¶ 6).  Turnipseede's purported expertise and algorithm were persuasive enough to convince C.G., a mathematician and author of multiple academic papers on sports wagering, to join his venture in 2015.  (*Id.*, PageID 210-11, ¶ 12-13).  Turnipseede then used C.G.'s expertise as a way to burnish his own, leading the victim-investors to believe that Turnipseede's algorithm must be successful because C.G. was involved.  Turnipseede's emails to victim-investors likewise touted his betting method: in March 2020, Turnipseede emailed investors that "our algorithms and placement specialists are coming off record years in earnings by volume." (*Id.*, PageID 212, ¶ 21(a)).  The fact that Turnipseede's betting method did not, in fact, produce the double-digit returns he touted to investors should not bar the application of the enhancement.  The Sixth Circuit upheld the application of a special skill enhancement where a former attorney was convicted of conspiracy to commit money laundering, even though the documents she produced and arguments she made were devoid of real law, where she used her legal training to assist her coconspirator in the commission and concealment of his fraud, and used legal jargon and official-looking documents to disorient the bank and convince it not to promptly rescind payment from the coconspirator's account.  *United States v. Tucci-Jarraf*, 939 F.3d 790 (6th Cir. 2019).  Throughout his years operating Moneyline Analytics and his other companies, Turnipseede used his purported special skill at sports betting to lure investors into believing his promises of substantial returns; he should not be able to avoid responsibility for it now that his claims have proven to be fraudulent.  This Court should therefore apply the two-level enhancement for Turnipseede's use of a special skill.

5

      C.      **TURNIPSEEDE SHOULD NOT RECEIVE THE ZERO-POINT OFFENDER ADJUSTMENT.**

The Sentencing Guidelines call for a two-level reduction in the offense level if a defendant assessed no criminal history points and meets certain other criteria; the most relevant in this case is that he did not "personally cause substantial financial hardship." U.S.S.G. § 4C1.1(a)(1), (6).  The guideline instructs the court to "consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to § 2B1.1." U.S.S.G. § 4C1.1(b)(3).  The list in Application Note 4(F) includes whether the offense resulted in the victim becoming insolvent, filing for bankruptcy, suffering substantial loss of a retirement fund (or other savings/investment fund), making substantial changes to employment or living arrangements, or suffering substantial harm to the ability to obtain credit.  U.S.S.G. § 2B1.1 app. n. 4(F).  There were approximately 72 identified victims in this case.  Approximately 11 victims have returned victim impact statements as of the date of this filing.  (R. 28-1: Victim Impact Statements, PageID 232-306; Email from Probation Officer with attached Victim Impact Statement to the parties and the Court (May 14, 2025, 9:50 a.m. EDT) (on file with author))[2]. Of those, several impact statements describe financial hardship consistent with the list in Application Note 4(F) (*sic* throughout):

- "I had an expectation of using my investment through Turnipseed as a means of funding my retirement.  Because of the loss associated with this "investment" I have had to curtail my lifestyle, as has my wife." (R. 28-1: Victim Impact Statements, PageID 245).

---

[2] The victim impact statement attached to the probation officer's May 14 email was returned after the final PSR was filed and was therefore not included with the other victim impact statements filed in R. 28-1.

- "I have long wanted to retire early and use my Masters Degree in political science to teach part time at a local college, for a lot less money than I'm earning now. I'm not sure that is possible any more, as I will now have to work full-time longer than I would like, in order to feel financially secure in retirement. … While I am not retired yet, this act will almost certainly delay my retirement by years." (*Id.*, PageID 299).

- "I am 72 years old, retired in 2021, and fighting cancer. The savings I invested with this company were my assurance to be able to retire and stay home resting and enjoying retirement. This money would have been the supplement to my Social Security check to help make ends meet every month. Needless to say, this company deprived me of a great part of my lifetime savings, that were supposed to give me peace of mind in my old age. … Now at the age of 72 and very sick, I find myself forced to go back to work in order to make enough money to make ends meet." (Email from Probation Officer with attached Victim Impact Statement (May 14, 2025, 9:50 a.m. EDT)).

Given the above, this Court should find that Turnipseede is ineligible for the zero-point offender adjustment under U.S.S.G. § 4C1.1 because he personally caused substantial financial hardship to at least one victim.

### III.     APPLICATION OF § 3553(A) FACTORS

After setting the final adjusted offense level at 28, reviewing the § 3553(a) factors should lead this Court to conclude that a Guidelines sentence of 78 to 97 months is appropriate in this case. The nature and circumstances of his offense, the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment, and the need to afford adequate

7

deterrence all argue strongly in favor of a Guidelines sentence. Matthew Turnipseede leveraged his relationships with family, longtime neighbors, and friends to defraud them, first luring them into investing into his gambling operation and then, when his betting system failed to materialize the promised returns, falsified "earnings" statements that he provided to his victims. Turnipseede promised double-digit returns; in reality, over 98% of the funds deposited into his business accounts came from victims investing their money with him; "earnings" payments to investors came from other investor money, not gambling winnings. (R. 28: PSR, PageID 209-10, ¶ 9). Even though his betting system was never successful, from 2015 through 2021 (when the scheme collapsed) Turnipseede continued to double down on both lying to his current investors and continuing to seek out new ones – always looking for new money to prop up his scheme.

While this case is Turnipseede's first felony conviction, this is not an instance of an otherwise law-abiding individual making one bad choice at one distinct moment in time. Turnipseede's fraud spanned years, during which he repeatedly made affirmative choice after affirmative choice to lie to and defraud people who trusted him. Every day he could have chosen to stop recruiting new investors or stop sending emails touting MLA's "successes." But day after day, week after week, month after month, year after year, he made affirmative decisions to continue his fraud.

The victim impact statements illustrate the harm Turnipseede caused to his victims – not only financial harm, but emotional harm as well. *See* R. 28-1: Victim Impact Statements, PageID 232-306. In addition to the financial pain, the victims discuss their feelings of betrayal upon discovering that someone they had known for years as a family friend had preyed on them and betrayed their trust. The likelihood of Turnipseede making any significant inroads on his restitution obligation is vanishingly small. The PSR indicates that Turnipseede's current

8

monthly cash flow is approximately $1,090.00. (*Id.*, PageID 222, ¶ 76). Even assuming he were able to apply that entire amount toward restitution payments, it would still take him over 351 years to pay everything back.

Although Turnipseede's risk of recidivism appears to be low – with a felony conviction, Turnipseede should no longer be able to be in a position where he has access to unwitting investors' money – risk of recidivism should not be the determinative factor in his sentencing. Additionally, any collateral consequences of Turnipseede's conviction, such as the length of these legal proceedings, the fact that he is now convicted a felon, and his embarrassment, if any, before his community, neighbors, and friends, should likewise not be considered by this Court. Consideration of these collateral consequences would tend to support shorter sentences for defendants from privileged backgrounds and would not satisfy the goals of sentencing. *United States v. Musgrave*, 761 F.3d 602, 606-07 (6th Cir. 2014). Further, because economic and fraud-based crimes are more rational, cool, and calculated then sudden crimes of passion or opportunity, they are prime candidates for general deterrence. *Id*. *See also United States v. Panyard*, No. 07-20037-2, 2009 WL 1099257, at * 12 (E.D. Mich. April 23, 2009) ("White-collar crimes…are often perceived as carrying substantially lesser punishment than other comparable offenses," making deterrence imperative when determining sentencing.).

The PSR identifies Turnipseede's history and characteristics as a potential ground for a downward variance because a Guidelines sentence "may be greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)." (R. 28: PSR, PageID 228, ¶ 107). However, Turnipseede's history and characteristics are unremarkable for a white collar defendant, and his lack of criminal history is already accounted for by the Guidelines placing him in Criminal History Category I. In addition, Turnipseede – as with many other white collar

criminals – was in the position to prey on people *because* of his clean record; it was what allowed him to earn the confidence of people with money to invest. In other words, his lack of criminal record was the means by which he put himself in a position to enrich himself while defrauding others.

A Guidelines sentence of 78 to 97 months would serve the purposes and principles of sentencing and would not create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Recent Ponzi scheme sentences nationwide have been substantially longer, reflecting the magnitude of the losses caused by these types of fraud schemes. *See*, *e.g.*, *United States v. Brenner*, No. 21-CR-772 (N.D. Ohio) (125 month sentence in $3.6 million investment fraud / Ponzi scheme); *United States v. Darayl Davis*, No. 18-CR-25 (N.D. Ill.) (160-month sentence in $5.1 million investment fraud / Ponzi scheme); *United States v. Jeremy Anderson*, No. 19-CR-23 (M.D. Fla.) (151-month sentence in $10 million Ponzi scheme); *United States v. Jeff Carpoff*, No. 20-CR-17 (E.D. Cal.) (30-year sentence in $1 billion Ponzi scheme); *United States v. Joshua Houchins*, No. 20-CR-245 (E.D.N.C.) (10-year sentence for $1.7 million Ponzi scheme). In sum, a prison sentence within the Guidelines range of 78-97 months (28/I) will meet the requirements for a sentence that is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

**IV.     RESTITUTION**

The United States requests that restitution be ordered in the amount of $4,731,165.10, which is the sum of the victim-investors' principal investments less any payments made by Turnipseede on or before the date he filed for bankruptcy in Nevada, May 13, 2021. *See* U.S.S.G. § 2B1.1 app. n. 3(D)(i) and (E)(iv). The government will provide the court a list of the

victims and amounts owed to each to be included in the judgment entry at the time of sentencing.[3]

Because many of the victim-investors in this case are also creditors in the bankruptcy proceedings and because the both the criminal case and bankruptcy proceedings concern the same transactions (investments in Turnipseede's betting companies), any payments or distributions made to the victim-investors by Turnipseede in the bankruptcy cases should also be credited toward his restitution in this case. The United States therefore asks that the following language be included in the Judgment Entry in the special instructions regarding the payment of monetary penalties:

> The Clerk's Office is to apply any credits to the Defendant's restitution obligation after Defendant's bankruptcy proceedings in the District of Nevada, case numbers 2:21bk14688 and 2:21bk12443, are concluded and the Trustee makes its final distributions and a final accounting is made to the Bankruptcy Court to ensure the Defendant's restitution obligation is accurate and prevents any windfall or double payment to any victim.

The United States asks that this Court not impose a fine in this case because Turnipseede's restitution obligation is so large.

## V.     CONCLUSION

For the reasons outlined above, this Court should set Turnipseede's total offense level at 28 after the application of all adjustments. Turnipseede's offense conduct and other relevant factors fall squarely within the scope of the facts and circumstances contemplated by the

---

[3] If there are updates to the amount of requested restitution after the filing of this Memorandum, the United States will provide an updated restitution figure at sentencing.

Guidelines; therefore, a Guidelines sentence within the 28/I range will accomplish the goals of 18 U.S.C. § 3553(a). Thus, the United States respectfully requests that the Court impose a sentence of 78-97 months in addition to ordering restitution as outlined above.

                Respectfully submitted,

                CAROL M. SKUTNIK
                Acting United States Attorney

By:   /s/ Erica D. Barnhill
                Erica D. Barnhill (OH: 0079309)
                Assistant United States Attorney
                United States Court House
                801 West Superior Avenue, Suite 400
                Cleveland, OH 44113
                (216) 622-3967
                (216) 522-2403 (facsimile)
                Erica.Barnhill@usdoj.gov